

FILED
May 11 2015, 10:03 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Victoria L. Bailey
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| T.S., <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | May 11, 2015 <br><br> Court of Appeals Case No. <br> 49A02-1410-JV-739 <br><br> Appeal from the Marion Superior Court, Juvenile Division <br><br> The Honorable Scott Stowers, Magistrate <br><br> The Honorable Marilyn A. Moores, Judge <br><br> Case No. 49D09-1312-JD-3747 |

**Vaidik, Chief Judge.**

# Case Summary

[1]     The Indiana Supreme Court held in *Smith v. State*, 765 N.E.2d 578 (Ind. 2002),

*reh'g denied*, that where the parties to criminal proceedings in question are not

identical, the doctrine of judicial estoppel does not apply against the State.

T.S., a juvenile, argues that *Smith* does not apply to juvenile-adjudication proceedings because they are civil. We find, however, that the rationale for not applying judicial estoppel against the State in criminal proceedings applies equally in the context of juvenile-delinquency proceedings. We therefore affirm the trial court.

## Facts and Procedural History

[2] On the evening of December 7, 2013, Connie Bayles went to Dollar Tree at the intersection of 38th Street and High School Road in Indianapolis. As Connie put her shopping bags in the back seat of her car, she felt something pressed against her back and heard someone say, "Give me the bag," which was a reference to the black purse she was carrying on her shoulder. Tr. p. 10. Thinking it was a joke, Connie turned around and said, "[Y]ou are kidding." *Id.* at 9. The person standing behind Connie was a black male wearing dark clothes; "it wasn't an older person and it wasn't a kid." *Id.* The male then pushed the gun harder into Connie's back and again said, "Give me the bag." *Id.* at 10. Because Connie did not recognize the male, she gave him her purse. The male ran toward 38th Street. Connie screamed, "Somebody help, help. He just robbed me. Somebody stop him," and then called the police. *Id.*

[3] Indianapolis Metropolitan Police Department Officer William Hornaday was parked at the BP gas station across the street from the strip mall where Dollar Tree was located when he saw a black male in black clothing running through the strip-mall parking lot. Officer Hornaday also saw a black Dodge with no

headlights on driving right behind the male. When the male stopped running, the Dodge stopped too. The male then got in the front passenger seat of the Dodge, and the Dodge headed toward High School Road. Officer Hornaday quickly followed the Dodge.

[4] When Officer Hornaday saw the Dodge drive through a stop sign without stopping or slowing down, he activated his lights. The Dodge slowed down but did not stop. Officer Hornaday called for backup, and additional officers arrived from the other direction in an attempt to block in the Dodge. However, the Dodge maneuvered around the officers' cars and took off at a high rate of speed. A pursuit followed with speeds reaching "well over sixty miles an hour." *Id.* at 42.

[5] The pursuit ended when the Dodge pulled up to a house on Fullwood Court. A black male, later identified as Leethanel Smith, got out of the driver's door and ran east. Officer Shawn Smith caught up with Leethanel one street over and, with a gun in his hand, yelled at Leethanel to stop, turn around, and put his hands up. Leethanel, however, kept running. Officer Smith pursued Leethanel on foot and saw Leethanel throw a black object. Officer Smith eventually caught up to Leethanel, and the two of them struggled in the snow. Officer Smith gained control of Leethanel and handcuffed him. Officers recovered the black object that Leethanel had thrown during the foot chase: Connie's purse.

[6] Meanwhile, the passenger remained in the car and was identified as fourteen-year-old T.S. The Dodge was registered to T.S.'s mother, Tewanda Smith. In

addition, Leethanel and Tewanda are cousins, and Leethanel lived with Tewanda and T.S. because he had no other place to go when he was released from prison for robbery three months earlier. As Officer Hornaday handcuffed T.S., Tewanda came out of the house and approached the passenger side of the Dodge. She exclaimed, "[W]hat is my gun doing in this car?" *Id.* at 52. Tewanda explained that the gun had been upstairs in her purse. At that point, Officer Hornaday looked in the Dodge and saw a gun in the open glove box. Later testing showed that T.S.'s thumb print was on the gun.

[7] A police officer took Connie to the scene for a show-up identification. Connie, however, was not able to make a positive identification of the person who robbed her.

[8] The State filed a petition alleging that T.S. was a delinquent based on acts that if committed by an adult would be Class B felony robbery, Class A misdemeanor dangerous possession of a firearm, and Class A misdemeanor carrying a handgun without a license. Before T.S.'s fact-finding hearing, Leethanel pled guilty to robbery. T.S.'s attorney questioned Leethanel at T.S.'s fact-finding hearing as follows:

> COUNSEL: Where was [T.S.] when you went up to the woman and took her purse?
>
> WITNESS: He was in the car.
>
> COUNSEL: Before you got out of the car, did you tell [T.S.] what you were going to do?
>
> WITNESS: No I just told him to sit back and kind of left the area quick.

* * * * *

COUNSEL: Okay did you and [T.S.] at any point get together and decide that you would commit a robbery together?

WITNESS:    No ma'am.

COUNSEL:  Okay did you at any point inform [T.S.] that this is something that you might do?

WITNESS:    No ma'am.

* * * * *

COUNSEL:  Okay when you spoke to the detective on this case, did you inform him that it was you and not [T.S.] that had robbed this woman?

WITNESS:    Yes ma'am.

COUNSEL:  And were you doing that just so [T.S.] wouldn't get into trouble because he robbed someone or were you telling the truth?

WITNESS:    I was telling the truth.

COUNSEL:  Okay now in addition to admitting this to the detective, you have also pled guilty to this crime, is that right?

WITNESS:    Yes ma'am.

COUNSEL:  At that was during a guilty plea hearing in criminal court 2 downtown?

WITNESS:    Yes ma'am.

*Id.* at 171-73.  The State then cross-examined Leethanel as follows:

COUNSEL:  During that hearing, what did you tell the Judge that you did?

WITNESS:    That I committed the robbery.

COUNSEL:  Okay did you tell the Judge that you helped [T.S.] commit the robbery?

WITNESS:    No ma'am.

COUNSEL:  Did you tell the Judge that you committed the robbery yourself and you put the gun to Connie Bayles' back?

WITNESS:    Yes ma'am.

*Id.* at 174.

[9] Leethanel also described the crime. According to Leethanel, though, when he approached Connie, he yelled that it was a "robbery," at which point Connie immediately started screaming. *Id.* at 170, 178-79. Although he had Tewanda's gun, Leethanel said he did not use it during the robbery because Connie was "already screaming"; therefore, he just put the gun in his pocket. *Id.* at 170. He denied touching Connie. *Id.* at 179.

[10] T.S. also testified at the fact-finding hearing. T.S., who acknowledged that Leethanel was like his brother because they were so close, denied planning the robbery with Leethanel and said he had no idea that Leethanel was going to commit a robbery. *Id.* at 198, 200.

[11] During closing argument, the State pointed out inconsistencies between Leethanel's and the victim's version of the events, arguing that Leethanel "has given you an entirely different account from the victim in this case." *Id.* at 209. Defense counsel responded that it would be "extremely unethical" for the State to say that Leethanel was lying, because it accepted his guilty plea to robbery based on the theory that Leethanel robbed Connie.[1] *Id.* at 213.

[12] The juvenile court entered a true finding for robbery. But because the court found that the handgun charges merged, it entered a true finding for Class A misdemeanor carrying a handgun without a license and a not-true finding for

---

[1] Notably, T.S. did not introduce into evidence a transcript containing the factual basis for Leethanel's guilty plea to robbery.

Class A misdemeanor dangerous possession of a firearm. Following a dispositional hearing, the court placed T.S. on probation with a suspended commitment to the Indiana Department of Correction.

[13] T.S. now appeals.

# Discussion and Decision

[14] T.S. argues that pursuant to the doctrine of judicial estoppel, the State "should have been estopped from arguing [during closing] that Leethanel was dishonest about T.S.'[s] lack of involvement in the Robbery." Appellant's Br. p. 6. T.S. concedes that because he did not object below, "the trial court [must have] committed fundamental error when it failed to prevent the State from making this argument" in order to prevail on appeal. *Id.* at 6, 9; *see also Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*.

[15] Judicial estoppel is a judicially created doctrine that seeks to prevent a litigant from asserting a position that is inconsistent with one asserted in the same or a previous proceeding. *Morgan Cnty. Hosp. v. Upham*, 884 N.E.2d 275, 280 (Ind. Ct. App. 2008), *trans. denied*. "Judicial estoppel is not intended to eliminate all inconsistencies; rather, it is designed to prevent litigants from playing 'fast and loose' with the courts. The primary purpose of judicial estoppel is not to protect litigants but to protect the integrity of the judiciary." *Id.* (quotation omitted). "The basic principle of judicial estoppel is that, absent a good explanation, a party should not be permitted to gain an advantage by litigating on one theory

and then pursue an incompatible theory in subsequent litigation." *Id.*
(quotation omitted). Judicial estoppel applies only to intentional
misrepresentation, so the dispositive issue supporting the application of judicial
estoppel is the bad-faith intent of the litigant subject to estoppel. *Id.*

[16] As T.S. acknowledges, judicial estoppel has no application against the State in
criminal proceedings. *Smith*, 765 N.E.2d at 582-83. The Indiana Supreme
Court in *Smith* said that "the purpose of judicial estoppel is not well served by
applying it against the government in criminal cases" because "the government
possesses unique status as a litigant and enjoys a great degree of latitude in
prosecuting the law and striking plea bargains." *Id.* at 583. The Court
explained that judicial estoppel protects the integrity of the judicial process "by
preventing a party and its counsel from playing fast and loose with the courts."
*Id.* As such, the Court found that the acceptance of a plea bargain from
Tommy Lampley on one theory of the case and the prosecution of Omond
Smith in a separate action on an alternate theory could not be construed as
"playing fast and loose" with the courts.[2] *Id.* at 584. Thus, the Court held that
"where the parties to the criminal proceedings are not identical, judicial
estoppel does not apply against the State." *Id.*

---

[2] Specifically, Smith argued that because the State accepted Lampley's guilty plea under Indiana Code
section 35-44-3-2 (now Indiana Code section 35-44.1-2-5), which has been interpreted to apply to people who
did not actively participate in the crime itself but who assisted a criminal after he committed a crime, the
doctrine of judicial estoppel precluded an instruction in Smith's trial that was based on Smith's aiding
Lampley in the killing. *Smith*, 765 N.E.2d at 582.

Because juvenile-delinquency proceedings are civil proceedings, T.S. claims that *Smith*, a criminal case, does not apply here. We find, however, that the rationale for not applying judicial estoppel against the State in criminal proceedings applies equally in the context of juvenile-delinquency proceedings. Therefore, accepting a plea agreement from Leethanel based on one theory of the case and pursuing a delinquency adjudication against T.S. in a separate action based on an alternate theory cannot be construed as playing fast and loose with the courts. Moreover, applying judicial estoppel to juvenile-delinquency proceedings but not criminal proceedings would be illogical. That is, a juvenile would be immunized against an adjudication based on an adult defendant's conviction, but there would be no correlating immunization if the juvenile was convicted first. Thus, we find that judicial estoppel does not apply to juvenile-delinquency proceedings for the same reasons that it does not apply to criminal proceedings. We therefore affirm the juvenile court.

Affirmed.

Kirsch, J., and Bradford, J., concur.